**STATE of Missouri, Respondent,**

v.

**L. Glendon HYDE, Appellant.**

**No. KCD 27940.**

Missouri Court of Appeals,
Kansas City District.

Dec. 31, 1975.

Motion for Rehearing and/or Transfer
Denied Jan. 19, 1976.

Gary Eldredge, Kansas City (Eldredge & Sterling, Kansas City, of counsel), for appellant.

John C. Danforth, Atty. Gen., Robert Presson, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., PRITCHARD, C. J., and TURNAGE, J.

PRITCHARD, Chief Judge.

Appellant was convicted by the verdict of a jury of the commission of the crime of the sale of a controlled substance (cocaine). The jury was unable to agree on the punishment and the court set it at fifteen years imprisonment in the Department of Corrections.

Appellant's first point is that he was entrapped as a matter of law into committing the offense. The evidence is this: Steven Dennis Courtois was employed by the Platte County Sheriff's office in narcotics investigation for which he had received special training with the Drug Abuse Law Enforcement program, a division of the federal government under the Department of Justice. On July 3, 1973, Courtois and another deputy, John Dickerson, decided to set up surveillance at 6100 Northwest 70th Street in Kansas City, which was the location of the Hunters Glen Apartments. With Courtois and Dickerson was "the cooperating individual", Susan Cole, who was seated in the passenger seat of the car. After they entered the Hunters Glen parking lot, Courtois stopped the car next to Building No. 8 and he observed appellant on the balcony. Appellant then walked towards Courtois' vehicle and entered it where he handed Courtois a folded piece of notebook paper containing a white powder, and Courtois handed him $70.00. Courtois performed a "field test" of the white powder which indicated that it "was positive for the presence of cocaine." The powder was later identified in court, after a chain of possession through its testing was shown, and it was proved to be cocaine.

Courtois had been advised by Susan Cole that appellant had some narcotics for sale. Susan Cole was a paid employee of Platte County, with whom Courtois had been working about a month. Courtois had met with appellant on two prior occasions, but on the first meeting (two or three weeks prior to June 20th), no sale occurred. On the second meeting with appellant, June 20, 1973, approximately one gram of white powder contained in a folded piece of newspaper was purchased from appellant by Susan Cole, to whom $70.00 was handed for the purpose of handing it to appellant by Courtois. The report made by Courtois did not accurately state the facts of the event in that it indicated that he received the white powder from appellant.

Susan Cole, called as a witness by appellant, testified that she started working for Platte County about the middle of May, 1973, the nature of her working being to "Buy drugs, to set drug deals up and the purchase of them." Before June 3rd, she had not seen appellant very many times because she had not known him well. She made a lot of phone calls, once, maybe twice a day, to appellant over a period of a month to a month and a half—a total of 35 to 40

calls. The nature of her conversation during the phone calls was to buy drugs. "Q. During these phone calls did he ever agree to sell you any drugs? A. No, not until later. Q. Alright. Now, did he indicate to you at any time that he had drugs available for sale? A. Not really. I just presumed." Susie did not recall buying any drugs from appellant prior to June 20th. Susie offered to buy drugs from appellant during the phone calls for money, and indicated to him that he could trust her, that she needed the cocaine for her own personal use, and that her state of physical condition was that she needed it. Susie admitted on cross-examination that she testified at a deposition on February 1, 1974, that she had called appellant two or three times a week. He had agreed to sell her drugs on other occasions, but had carried through only on July 3rd and on one other occasion. (Although Susie could not give the date, apparently the one other occasion of sale was on June 20, as testified to by Courtois.)

Appellant testified that he first met Susie Cole around the beginning or middle of May. He did not sell her any narcotics before .June 20th. He received repeated phone calls from Susie starting around the middle of May, in the evening probably once a day and sometimes twice a day "for a matter of six, eight weeks." On June 20th, Susie called him and told him "she was very sick, that she was throwing up, was breaking out into a rash and she needed cocaine." After that phone call appellant called somebody that he knew might have some "and he said he did." He waited for Susie to call him back and he then told her that he probably would be able to help her. He went into Kansas City and got it, paying $60.00 for it. For that June 20th sale, appellant was charged with selling to Courtois, but as a result of depositions that charge was dismissed by the prosecuting attorney. Thereafter, the phone calls continued from Susie who told him she did not have anybody to get any cocaine from, and that she was sick and in need of it. On July 3rd, she called and said she was sick

again, and appellant advised her to go to the Western Missouri Health Center and have her problem taken care of. "She said she was hurting, in physical pain so I agreed to sell to her again." Appellant went to Kansas City again and found some which he sold for $60.00, the same amount that he had paid for it. On direct examination, appellant testified further: "Q. You haven't been arrested for the sale of narcotics? A. No. Q. Alright. Now, you're not telling the members of the jury that you have not in the past used narcotics, are you? A. No, I'm not. Q. What have you used? A. Marijuana, hashish, a little cocaine." On cross-examination, he testified: "Q. Could Susie Cole have called you or been present and asked you specifically with regard to obtaining some LSD while you were under the influence of what you thought to be a narcotic drug? A. If it was on a Saturday, possibly."

■■■ Certainly, because of the activities of Susie Cole, Courtois and Dickerson, there was an issue of entrapment in this case, which issue *was* submitted to the jury by Instruction No. 6. Appellant says by his very abstract Point I [which utterly fails to comply with Rule 84.04(d)]: "Entrapment was Established as a Matter of Law." The state's evidence here does not reach the stature of the evidence of entrapment in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), where the court held that entrapment was established as a matter of law from the undisputed evidence of prosecution witnesses. There was no evidence in *Sherman* which would give a legitimate inference that Sherman was predisposed to commit the offense charged, and evidence of predisposition is admissible to rebut the defense of entrapment. 25 Am.Jur.2d Drugs, Narcotics and Poisons, § 46, p. 322. The question really is what type of evidence could the jury properly consider as bearing on the issue of predisposition to commit the offense. Here, the charge was that of an illegal sale of cocaine. From appellant's own lips came

the evidence that he was a user of "marijuana, hashish, a little cocaine," and he testified further that, if Susie Cole had called him on a Saturday he could possibly have been under the influence of a narcotic drug.

The *possession* of marijuana, hashish and cocaine is prohibited under § 195.020, RSMo 1969, as those substances are listed in § 195.017 2.(4)(j) and § 195.017 4.(1)(d). Appellant acknowledged that he knew, from two sources, where he could purchase cocaine in Kansas City, and that he had done so. The evidence shows that he had been "trafficking" in these prohibited substances and had knowledge thereof. Cf. *State v. Davis*, 450 S.W.2d 168, 171 (Mo.1970). Although no case has been found where a prior "possession" of narcotics would be evidence of a "predisposition to sell" narcotics, there are general statements which support the conclusion that the prior possession would be sufficient to show a predisposition to commit the charged offense so as to rebut the defense of entrapment. In *United States v. Becker*, 62 F.2d 1007, 1009 (C.A. 2d 1933), the court said, "Even though only those may be induced to commit crime who are already so engaged, it would be a narrow limitation to require that the crime charged should formally be the same. A habitual burglar may steal; a counterfeiter, pass his money; a forger, embezzle. The whole doctrine [of entrapment] derives from a spontaneous moral revulsion against using the powers of government to beguile innocent, though ductile, persons into lapses which they might otherwise resist. *Such an emotion is out of place, if they are already embarked in conduct morally indistinguishable, and of the same kind.*" [Emphasis and brackets added.] And note the comment, 73 Harvard Law Review, 1333, 1339 (1960), "Therefore, if the defense of entrapment has not already become available under either the first [type of inducement] or second [nature of the crime] step of the proposed test, or has not already been foreclosed under the first step, it should be available unless the prosecution can show by a preponderance of the evidence that the defendant was engaged in a course of criminal activity similar to the crime which he performed at the invitation of law enforcement officers. [Brackets added.] As proof of this fact, evidence of recent dissimilar crimes which have gone unpunished, and evidence of prior convictions would be relevant but circumstantial. * * * The willingness with which the defendant complied, in the light of the type of inducement offered and the seriousness of the criminal act, can afford strong indication of a continuing course of similar conduct, but some additional evidence seems necessary. This might be supplied by a *modus operandi* indicating familiarity with the criminal business, by a facility in obtaining contraband, by possession of the precise tools necessary for the offense, or by statements of the accused."

In *Walker v. United States*, 285 F.2d 52, 56[1–3] (C.A. 5th 1960), it was said, "From a résumé of the testimony set forth above, including circumstances indicating that the relationship between White and defendant was casual, defendant was willing to deal with White by telephone, the clandestine methods employed by him in hiding narcotics in the ditch, *his previous experiences with illicit dealings in narcotics* and his own conduct in both transactions, the jury could reasonably have concluded *that defendant was a person engaged in illicit narcotic drugs traffic*, 'not an innocent person in whose mind the Government implanted a criminal design'. And the jury could have believed he had a 'predisposition' and 'intention or readiness' to commit the crimes charged, that these offenses were not 'the product of the creative activity' of law enforcement officials." (Emphasis added.) See also *Carlton v. United States*, 198 F.2d 795, 798, 799 (C.A. 9th 1952). Compare *Pulido v. United States*, 425 F.2d 1391, 1393, et seq. (C.A. 9th 1970). The evidence was sufficient for the jury to consider as rebuttal of, or controverting, the issue of entrapment, and the court did not err in submit-

ting that issue to the jury. Appellant suggests in argument that there must exist a reasonable suspicion upon the part of law enforcement officers that an accused was engaged in narcotic traffic before they could proceed to entrap him. This suggestion is answered by *State v. Burrow*, 514 S.W.2d 585, 589 (Mo.1974), where it was held that "reasonable suspicion" is only an evidentiary element to be considered and is not properly an independent element for proof of nonentrapment. As noted, there is a sufficiency of other evidence on the issue of nonentrapment in this case. Point I is overruled.

■ Again abstractly stated, appellant's Point II sets forth that "The objective test of entrapment should be adopted." Suffice it to say that application of the subjective test of entrapment is the rule of this state. *State v. Golightly*, 495 S.W.2d 746, 750[1] (Mo.App.1973), and cases cited. Point II is therefore overruled.

■ Point III, again in the abstract, is "The Fifteen Year Sentence Should Be Vacated." In this state it has long been held that an appellate court will not interfere with a punishment imposed within the range of penalties imposed by legislative enactment. *Golightly*, supra; *State v. Stock*, 463 S.W.2d 889, 895 (Mo.1971). Point III is overruled.

The judgment is affirmed.

All concur.